**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Steven E. SAPERSTEIN,
Defendant-Appellant.**

No. 81–1670.

United States Court of Appeals,
Sixth Circuit.

Argued May 5, 1982.

Decided Dec. 8, 1983.

Daniel J. Blank (argued), Birmingham, Mich., for defendant-appellant.

Leonard R. Gilman, U.S. Atty., Susan Daltuva, Asst. U.S. Atty. (argued), Detroit, Mich., for plaintiff-appellee.

Before KEITH, MERRITT and JONES, Circuit Judges.

NATHANIEL R. JONES, Circuit Judge.

Defendant-appellant, Steven E. Saperstein, was stopped at the Detroit Metropolitan Airport by Drug Enforcement Agency (DEA) personnel who ultimately conducted a search of his suitcase and discovered marijuana. Saperstein appeals from his subsequent conviction for possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1).[1] His contention on appeal is that the district court erred in denying his motion to suppress the evidence seized during the airport search. The appellant objects to the initial seizure of his person *and* the subsequent seizure of his luggage, claiming that both were in violation of the Fourth Amendment. In light of the most recent Supreme Court pronouncements on the scope of permissible airport searches, *Florida v. Royer*, 460 U.S. ——, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) and *United States v. Place*, —— U.S. ——, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), we agree. We, thus, vacate the conviction and sentence entered by the district court and remand for further proceedings not inconsistent with this opinion.

I.

Shortly after noon on March 25, 1981, Special Agent Demnik, assigned to the Detroit Metropolitan Airport interdiction unit, received a telephone call from an American Airlines ticket agent. The ticket agent informed Demnik that an individual by the name of S. S*h*aperstein had checked in for flight 328 to New York's LaGuardia Airport, had checked a large suitcase which appeared to be empty, and had scheduled his return on American Airlines flight 215 at approximately 9:00 p.m. that evening. The individual was described as a white male, approximately 28 years of age, with short black hair and a full beard. He was purportedly wearing a gray sports coat and sunglasses when purchasing his ticket.

Based on this information, Demnik conducted surveillance of the individual described and watched him board the flight to New York. Agent Demnik then interviewed the ticket agent. She stated that the reservation had been made at two o'clock on the previous day and had been paid for in cash. Demnik and another agent decided to monitor incoming flight 215, returning to Detroit from New York. The appellant was observed exiting the plane and. was followed to the baggage claims area. The appellant retrieved a large gray-black suitcase. Judging from the manner in which the suitcase was lifted, the agents believed that the suitcase was not empty but, rather, "had weight to it." However, the agents had no description of the suitcase checked through to New York and, thus, had no way of knowing whether the bag appellant claimed in Detroit was the same one the ticket agent had believed was empty.

Agent Demnik followed the appellant outside the airline terminal to the curb. The appellant stood at curbside for twenty to thirty seconds, as if he were waiting to

1. The indictment reads as follows:
   The Grand Jury Charges
   **Count One**
   (21 U.S.C. § 841(a)(1)—Possession with Intent to Distribute Marihuana)
   That on or about March 25, 1981, in the Eastern District of Michigan, Southern Division, Steven E. Saperstein, defendant herein, did knowingly, intentionally and unlawfully possess with intent to distribute approximately 46 kilograms of marihuana, a Schedule I, controlled substance; in violation of Section 841(a)(1), Title 21, United States Code.

be picked up. Demnik approached the appellant, identified himself as a federal narcotics officer, and asked if the appellant would mind answering a few questions. The agent was dressed in casual clothes, with no weapon drawn. He stood facing the appellant with his back to the pickup lane. The appellant agreed to answer some questions.

Although he was confused as to the order of his statements and questions, Demnik testified that he informed the appellant that he was involved in the surveillance of drug couriers and that he specifically had information concerning the appellant's possible involvement in drug transportation. Demnik asked if the appellant had just arrived from New York and he stated that he had. Demnik then asked to see the airline ticket and some identification. The appellant handed the ticket and a driver's license bearing the name Steven Edward Saperstein to Demnik. The appellant pointed out the discrepancy between the name on the ticket, Saperstein, and that on the license, S*h*aperstein, indicating that the airline ticket agent had apparently misspelled his name. The agent testified that he attached no significance to this point.

Demnik asked the appellant why he had gone to New York and the appellant indicated that he had been on a business trip. When asked why he would have such a large suitcase for a short business trip, the appellant did not reply. When asked whether the suitcase contained personal belongings or business papers, the appellant denied knowing what the suitcase contained.

About this time, agent Anderson joined Demnik at curbside. Both agents purportedly attempted to clarify certain "discrepancies". Specifically, the agents wanted to know why Saperstein had claimed the bag if he did not know what it contained. When the agents asked for permission to search the suitcase, the appellant told them that he had no idea what the combination to the lock was. By way of explanation, the appellant indicated that he had met an individual in New York who had asked the

defendant to deliver the suitcase to the friend who was to pick him up at the Detroit airport. Noticing that the suitcase tag bore the name of "Larry Glazer", Demnik asked if Glazer was the individual to whom he was to deliver the suitcase, and the appellant said yes. Demnik also asked whether the appellant had checked any baggage when he left Detroit and, contrary to the ticket agent's claim, he said no.

At this point the appellant was asked to accompany the agents to their office in the terminal "to clarify some discrepancies." The appellant agreed to do so. The agents again asked for the appellant's ticket and license and continued questioning him about his travels. The agents pointed out that a baggage claim check for the Detroit-New York route was attached to his ticket and asked why it would be there if no bag had been checked. The appellant had no response. Agent Demnik again asked how the appellant had come to possess the suitcase and the appellant again stated that he had received it in New York and was asked to give it to Glazer upon arriving in Detroit. A second request to search the suitcase was denied.

Demnik then contacted the United States Attorney's office in Detroit and was advised to keep the suitcase and obtain a search warrant. The appellant was given a receipt and left the office. Forty-five minutes to an hour had elapsed from the time of the curbside encounter until the appellant left the office.

After the appellant left the office, Demnik tried to secure a narcotic-detecting dog from the Detroit police but the dog handler was unavailable. At 10:30 a.m. the next day, approximately thirteen and one-half hours after the seizure of the suitcase, law enforcement personnel conducted a canine "sniff search" and the appellant's suitcase was designated a "positive hit." A search warrant was then obtained and ten pounds of marijuana was discovered inside the luggage.

On May 21, 1981, a single-count indictment was filed, charging the appellant with possession with intent to distribute marijua-

na in violation of 21 U.S.C. § 841(a)(1). Evidentiary hearings were held on June 15 and 16, 1981, to determine the constitutionality of the conduct of the DEA agents. The trial court then gave an oral opinion, denying the previously-filed motion to suppress the evidence seized during the search. On July 24, 1981, a trial was held before the court. The appellant was found guilty and sentenced to four months in jail with a three-year special parole term. This appeal followed.[2]

## II.

As the incidents of airport stops and searches increase with the expanded use of the so-called "drug courier profile,"[3] the need to carefully define the permissible bounds of law enforcement activity in this context has become more pronounced. Until recently, the Supreme Court had supplied little guidance in the area, leaving the lower courts to grapple with the proper application of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), in light of *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) and *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980).[4] On March 23,

1983, the Supreme Court decided *Florida v. Royer, supra,* and on June 20, 1983 it handed down its decision in *United States v. Place, supra.* The first addressed the legality of seizures of the person based on the use of the drug courier profile and the latter discussed the seizure of luggage absent probable cause. The pair further clarifies the nature of the Fourth Amendment analysis required in the airport context and clearly provides the most pertinent guidance for a resolution of this appeal.

### A. Seizure of the Person—Florida v. Royer

The appellant first contends that the evidence must be suppressed because it was obtained pursuant to an illegal seizure of his person within the meaning of the Fourth Amendment. The government contends, and the district court held, that at no time was the defendant seized. In the alternative, the district court ruled that even if there had been a seizure, the seizure was reasonable and, thus, permissible under the Fourth Amendment.

■ The first question then is whether or not Saperstein was ever seized at the Detroit airport. If not, our consideration of this appeal is at an end. In *United States*

---

**2.** Before the filing of the present appeal, Saperstein requested, and was granted, release on bond pending appeal.

**3.** "The 'drug courier profile' is an abstract of characteristics found to be typical of persons transporting illegal drugs." *Florida v. Royer,* 460 U.S. ——, —— n. 2, 103 S.Ct. 1319, 1322 n. 2, 75 L.Ed.2d 229 (1983). See also note 8, *infra.*

**4.** In seemingly contradictory rulings decided only one month apart, the Supreme Court first upheld, and then reversed, convictions which were partially based on evidence obtained through searches purportedly justified by the use of the drug courier profile.

In *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), the Supreme Court reversed an earlier decision of this Court dealing with the use of the drug courier profile. There, we had reversed a conviction finding that the use of the profile could not possibly give rise to reasonable suspicion sufficient for an intrusion and that even if the intrusion had been permissible, probable cause was required before taking the suspect to a DEA

office. Either was deemed sufficient to invalidate the consent to search ultimately given by Mendenhall. The Supreme Court reversed in an extremely fractured opinion.

The majority divided on whether the initial stop was intrusive enough to trigger the protections of the fourth amendment. Justices Stewart and Rehnquist found that no seizure had occurred. Three other Justices concurred in the result but did not deal with the seizure question, finding simply that the issue could not serve as a basis for reversal because it was not raised below. (Burger, Powell, Blackman) Four justices believed that the *stop* was a seizure. (White, Brennan, Marshall, Stevens).

In *Reid v. Georgia,* the court held that the DEA agents there could not, *as a matter of law,* have suspected the petitioner of drug trafficking based on his purported conformity with certain "profile" characteristics. The opinion was in the form of a per curiam with very little substantive analysis. Justices Powell, Burger and Blackman concurred in the result but again declined to reach the seizure issue. Justice Rehnquist dissented on the basis of the plurality opinion in *Mendenhall.* Interestingly, Justice Stewart joined the per curiam majority.

*v. Mendenhall, supra,* Justice Stewart, writing for the Court, took the position that a defendant had not been seized when federal agents approached her, requested her identification and airline ticket and posed a few questions regarding her travels. Justice Stewart reasoned that "nothing in the record suggests that the respondent had any objective reason to believe that she was not free to end the conversation in the concourse and proceed on her way." 446 U.S. at 555, 100 S.Ct. at 1878. Although Justice Stewart's opinion in *Mendenhall* was a plurality opinion, thus providing little binding precedent,[5] this Court has adopted the test utilized there for determining whether and when a seizure has occurred—i.e. whether, under the totality of the circumstances, a reasonable person would have believed he or she was not free to walk away. *United States v. Moore,* 675 F.2d 802 (6th Cir.1982); *United States v. Jefferson,* 650 F.2d 854 (6th Cir.1981).

█ The district court found the present case comparable to *Mendenhall* and relied on its plurality holding to find that no seizure had occurred. The district court simply reads the *Mendenhall* court's analysis of the seizure issue too broadly. Justice Stewart reasoned that a mere "encounter" had occurred during the initial questioning of Mendenhall. Only Justice Rehnquist joined in this view, however. The concurrence refused to reach the seizure issue because it had not been reached below, but did indicate that if the question were before the Court it would have been extremely close. The clear implication of the concurrence—which ultimately held that assuming, a seizure had occurred, it was a reasonable one—was that a seizure analysis *was* appropriate. Moreover, to the extent that Justice Stewart's nonseizure holding can be read to establish any clear precedent, it has clearly been limited to its facts. In *United States v. Jefferson, supra,* this Court considered the government's contention that a seizure had not occurred in circumstances somewhat similar to those we now consider. There, we concluded:

> In this case, agent Markonni did not merely stop Jefferson to ask him a few questions; he stopped him and immediately after identifying himself as a DEA agent requested Jefferson to accompany him to the baggage claims office. In these circumstances, Jefferson could not reasonably believe that he was free to leave. This was a "seizure" within the meaning of the Fourth Amendment.

650 F.2d at 856 (footnote omitted). In other words, once factors beyond those present in *Mendenhall* exist, which factors would indicate to a reasonable person that he or she was not free to leave, the precise holding of *Mendenhall* is inapplicable. *See also United States v. Berry,* 636 F.2d 1075 (5th Cir.1981) ("appellants were 'seized' at the time agent Markonni told appellant Berry that they had violated Georgia law by giving false identification to a law enforcement officer").

The Supreme Court implicitly approved this precise analysis when it held that the stop which occurred in *Florida v. Royer,*

---

5. *See e.g. Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977) ("when a fragmented court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the court may be viewed as that position taken by those members who concurred in the judgment on the narrowest grounds ..."); *Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976) (court addressed Georgia capital punishment law in light of nine-opinion decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)—held that only "narrowest grounds" were entitled to precedential weight and defined those as the highest common denominator of majority agreement.)

Applying these principles to *Mendenhall,* it appears that the narrowest grounds for decision are the procedural ones—i.e. because the seizure issue was not raised below, it should not serve as grounds for reversal and, hence, was not addressed by those concurring in the result. *See* discussion in note 4, *supra.* Thus, it appears that the precise binding rule of law to be gleaned from *Mendenhall* is arguably limited by the Court's own standards for reading such opinions. *See also Trans World Airlines v. Hardison,* 432 U.S. 63, 73 n. 8, 97 S.Ct. 2264, 2271 n. 8, 53 L.Ed.2d 113 (1977) (citing *Neil v. Biggers,* 409 U.S. 188, 192, 93 S.Ct. 375, 378, 34 L.Ed.2d 401 (1972) (judgment entered by an equally divided court is not entitled to precedential weight).

*supra,* was most certainly a seizure. The Court emphasized the factors which amounted to a sufficient show of authority to indicate to Royer that his freedom was limited:

> Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment. These circumstances surely amount to a show of official authority such that "a reasonable person would have believed he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (opinion of Stewart, J.).

460 U.S. at ——; 103 S.Ct. at 1326.[6] *Royer,* by citing the *Mendenhall* seizure test, clearly establishes the outer limits of a mere "encounter". One need only look to *Royer* to readily conclude that the district court erred when it held that Saperstein was never seized under the Fourth Amendment.

Agent Demnik began his inquiry by simply asking the appellant if he would answer a few questions. This nonthreatening approach has been deemed something less than a seizure and, thus, placed within the bounds of the type of initial encounter in *Mendenhall, See United States v. Moore,* 675 F.2d at 807. Demnik went on, however. He followed this arguably innocuous request with the definite statement that he had information concerning the appellant and his probable activities as a drug courier. The appellant testified that once having been accused of drug trafficking by a DEA agent who was standing directly between him and any reasonable form of transportation, while being asked clearly incriminating questions, he reasonably believed he was not free to leave.[7] Considering this factor in combination with the added presence of a second agent, the request to move to the DEA office, the second request for Saperstein's license and ticket and the failure to inform him that he was free to leave, we are convinced that a reasonable person in Saperstein's position would have believed that he was *not* free to leave and, thus, that the appellant had clearly been seized. *Florida v. Royer, supra.*

■ Accordingly, to the extent that the denial of the suppression motion was based on the district court's conclusion that no seizure of the appellant's person had occurred, that order is clearly wrong and any subsequent conviction must be vacated. We still must address, however, the district court's alternative holding, and the government's additional argument, that if a seizure did occur, it was reasonable. A resolution of this issue would generally require a two-step analysis: (1) whether the elements

---

**6.** In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) the court considered the circumstances under which there will be sufficient restraint to constitute a seizure: a seizure has occurred when "the officer by means of physical force *or show of authority,* has in some way restrained the liberty of a citizen." *Id.* at 19, n. 16, 88 S.Ct. at 1879, n. 16. (Emphasis added).

**7.** The district judge rejected the appellant's argument as follows:

> [P]laintiff, in his argument before the court today, indicates that in the questioning which took place at the curbside, the defendant was told he was a suspect. The court does not interpret the testimony in that manner, rather feeling that the testimony was that the agents said that they were within the purview of their duties, investigating couriers

involved with the transportation of narcotics. There might have been a drawable inference from that that the defendant was a suspect, but the court does not find in this record testimony that the defendant himself was specifically a suspect.

If this statement was meant to be a finding that the appellant was not specifically told that he was a suspect, that finding is clearly erroneous. The error is evident from the following exchange between defense counsel and Demnik at the suppression hearing:

> Q. Did you advise Mr. Saperstein that not only were you investigating potential couriers, but that you had information concerning Mr. Saperstein and his possible involvement in drug transportation?
> A. Yes.

of the drug courier profile exhibited by Saperstein were sufficient to justify *any* form of initial stop; and, if so, (2) whether the boundaries of a justifiable stop were overstepped. *See Terry v. Ohio,* 392 U.S. at 19, 88 S.Ct. at 1878; *Florida v. Royer,* —— U.S. at ——, 103 S.Ct. at 1325.

In *Mendenhall,* the three concurring Justices reasoned that the elements of the drug-courier profile, as they were manifested by *Mendenhall* and observed by the particular agent involved, justified an investigative stop. The concurrence noted that Mendenhall was very nervous and that all her motions and activities indicated a design to evade detection.[8] From the time she left the plane she allegedly reinforced the agent's suspicions with her every movement. The conclusion that Mendenhall's actions justified a seizure was only joined by three Justices, however, and was not even mentioned by the lead opinion. In addition, Justice Powell, writing for the concurrence, emphasized that he did not believe that reliance on the drug courier profile would *necessarily* demonstrate reasonable suspicion, noting that "each case raising a Fourth Amendment issue must be judged on its own facts." 446 U.S. at 565 n. 6, 100 S.Ct. at 1883 n. 6.

In *Royer,* the plurality opinion of the Court indicated that, on the facts before it, there existed sufficient reasonable suspicion to justify a temporary detention within the bounds of *Terry v. Ohio, supra.* The Court based this conclusion on the fact that Royer exhibited several factors which DEA officers claim to be characteristic of drug traffickers. They were: (1) Royer was traveling under an assumed name; (2) he paid cash, in large denominations, for a one-way ticket; (3) rather than complete the airline identification tag in full, which included space for an address and telephone number, he wrote only a name and destination; (4)

he was young, between 25 and 35, and casually dressed; (5) he was pale, nervous and continually looked around at others; and (6) he carried American Tourister luggage which appeared heavy. The Court reasoned that when taking these factors in combination, they constituted "adequate grounds for suspecting Royer of carrying drugs and for temporarily detaining him and his luggage while attempting to verify or dispel their suspicions in a manner that did not exceed the limits of an investigative detention." 460 U.S. at ——, 103 S.Ct. at 1326.

Significantly, however, the Supreme Court still did not condone, or even specifically address, the use of the drug courier profile to justify investigative stops in all cases. Rather, the Court simply acknowledged that the confluence of the various characteristics exhibited by Royer could create a sufficient degree of suspicion *in that case.* It is also significant that the Supreme Court did not overrule its earlier decision in *Reid v. Georgia, supra,* when it handed down *Royer.* There, the Court held, in a per curiam opinion, that the following factors were insufficient to support *any* seizure: (1) the defendant had arrived from Fort Lauderdale, a "source city;" (2) the defendant arrived early in the morning, when law enforcement activity was diminished; (3) the defendant and his companion appeared to be trying to conceal the fact that they were traveling together; (4) the defendant's trip was short; he stayed in Fort Lauderdale only one day; and (5) the defendant and his companion had no luggage other than identical shoulder bags. Moreover, the opinion of the Court in *Royer* was also only a plurality. The concurring opinion of Justice Brennan, thus constituting a majority for purposes of the ultimate result reached, specifically found that under *Terry v. Ohio* the initial stop was itself

---

8. Mendenhall arrived in Detroit from Los Angeles, left the plane last, scanned the entire gate area and walked slowly toward the baggage area. When she arrived there, she claimed no baggage and, instead, went to the Eastern Airlines ticket counter. Though she carried an American Airlines ticket which would take her

on to Pittsburgh, she asked for an Eastern Airlines ticket to the same destination. This final factor was deemed highly significant and, when taken in combination with the rest of her behavior, purportedly prompted the agents to stop her.

illegal. Clearly, the DEA drug courier profile has simply *not* received a blanket stamp of approval by the Supreme Court. Rather, we are still left to answer the question of whether in each particular case the combination of facts present and the manner in which they are exhibited justifies a stop. While a review of the case-by-case analysis found in the various airport search cases narrows the inquiry somewhat, a resort to the elemental principles of *Terry v. Ohio* finally dictates the resolution of the Fourth Amendment issue presented here.

Saperstein, like so many others before him, allegedly exhibited certain characteristics which Special Agent Demnik deemed significant in light of his experience with drug traffickers. First, he was traveling from New York, a purported source city, to Detroit, a city characterized as "very active" in the drug trade. He also had apparently checked a large empty suitcase, an act which the government dubs "a very suspicious factor." In addition, the appellant made the reservation at 2:00 p.m. on the preceding day, a short-notice reservation purportedly typical of drug couriers. The fact that the airline ticket was paid for in cash was also deemed significant since cash transactions leave no record. Finally, upon his return, the appellant lifted his suitcase "in a manner" which caused Demnik to conclude that it was not then empty. Obviously, these are not the same elements of the profile which Royer purportedly acted out, nor are they identical to those in *Reid* or *Mendenhall*. Accordingly, no statement from the Supreme Court specifically addressing the profile commands the conclusion that they either are, or are not, adequate to give rise to the kind of suspicion which would support any detention.

There are a large variety of traits which have characteristically been attributed to drug couriers, traits which may then combine or interact in any number of ways.[9] Recognizing that it is the overall effect of a person's behavior which gives rise to rea-

sonable suspicion, this Court has still deemed certain behavior characteristics inherently unsuspicious and, thus, entitled to no weight in the calculation. *See e.g. United States v. Andrews*, 600 F.2d 563, 566 (6th Cir.1979) (nervousness deemed entirely consistent with behavior among innocent airport travelers and is entitled to no weight). *See also United States v. McCaleb*, 552 F.2d 717, 720 (6th Cir.1977). Travel to and from a source city, relied upon in the instant case, is one such innocent behavior trait:

> Similarly, travel from Los Angeles cannot be regarded as in any way suspicious. Los Angeles may indeed be a major narcotics distribution center, but the probability that any given airplane passenger from that city is a drug courier is infinitesimally small. Such a flimsy factor should not be allowed to justify—or help justify—the stopping of travelers from the nation's third largest city. Moreover, our experience with DEA agent testimony in other cases makes us wonder whether there exists any city in the country which a DEA agent will not characterize as either a major narcotics distribution center or a city through which drug couriers pass on their way to a major narcotics distribution center.

*United States v. Andrews*, 600 F.2d at 567. The Supreme Court similarly was unwilling to find the presence of this factor determinative in *Reid*. The same holds true for the short-trip argument the government cites; its presence carried little or no weight for the court in *Reid* because it was so completely consistent with the normal behavior of innocent business commuters.

Moreover, it is significant that the government's extended reliance on the presence of the cash transaction carries no weight *in this particular case*. The purported benefit of such transactions to drug couriers is anonymity. However, the government admits that the appellant in this case not only furnished his own name

---

**9.** There is no consistent amalgam of traits that ineluctably leads to a stop. In fact, the combination of factors looked for not only varies among agents, but varies from airport to airport as well. *See* Greenburg, *Drug Courier Profiles, Mendhall and Ried: Analyzing Police Intrusions on Less Than Probable Cause,* 19 Am.Crim.L.Rev. 49, 52 n. 24 (1981).

to the airline ticket agent, but left a valid call-back number as well. Finally, there was no claim that the appellants demeanor or general behavior, either when boarding the plane for New York or upon return to Detroit, was in any way suspicious or indicative of a desire to evade detection.

The district court apparently recognized the weakness of the government's case when based only on its ability to point to these factors. The court noted that the use of this profile was "in and of itself" insufficient to justify a seizure. However, the district court then concluded that the fact that the suitcase was empty when the defendant departed but "had weight" when he returned bolstered the evidence of suspicious activity to the point where "it barely meets the minimum threshold of something in addition to the courier profile."

We are compelled to disagree with the lower court's assessment of the suitcase evidence and its decision that such evidence could be determinative in this case. The Supreme Court in *Reid* rejected the factors relied upon by the government because the cited circumstances:

> describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foun-

dation as there was in this case could justify a seizure.

448 U.S. at 438. Similarly, innocent reasons can be given for checking an empty suitcase to New York. An individual may be traveling to New York for a shopping spree, or to pick up materials, samples or documents in connection with his trade or business. Thus, the empty suitcase could not, alone or in combination with the other factors present here, provide a reasonable basis for a seizure.[10]

■ The Supreme Court's key decision in *Terry v. Ohio, supra,* clearly supports the conclusion that the amalgam of traits elicited by Saperstein were insufficient to justify the DEA agents actions.[11] Before *Terry* no seizures of the person were deemed permissible under the Fourth Amendment absent probable cause. *Terry* created a limited exception to this general rule—allowing investigative steps on something less than probable cause where the governmental interest is important and the law enforcement officer is "able to point to *specific* and *articulable* facts, which taken together with *rational* inferences from those facts reasonably warrant that intrusion." 392 U.S. at 21, 88 S.Ct. at 1880. (Emphasis added) *See also Florida v. Royer,* 460 U.S. at ——, 103

---

**10.** In an apparent attempt to bolster the significance of the suitcase factor, the government cites three cases which purportedly recognize that checking a large empty suitcase is a behavior characteristic of drug couriers: *United States v. Chatman,* 573 F.2d 565 (9th Cir.1977); *United States v. Himmelwright,* 551 F.2d 991 (5th Cir.1977); *United States v. Forbicetta,* 484 F.2d 645 (5th Cir.1973). (*United States* Brief at 19). Examination reveals that none of these cases supports the government's position. In *Chatman,* the defendant carried no luggage. 573 F.2d at 566. In *Himmelwright,* the defendant did have luggage, but there was no indication that it was empty and the contraband was concealed on her person. 551 F.2d 993. And in *Forbicetta,* the defendant, though incidentally carrying one suitcase, was similarly carrying 2½ pounds of cocaine *on her person.* Not one of the cases relied upon the presence of a large empty suitcase to justify the seizure.

**11.** A return to *Terry v. Ohio* is the clearest way to resolve the Fourth Amendment issues raised in this context. To date, the only Supreme

Court case dealing with the drug courier profile which was not a plurality decision was *Reid,* and *Reid* itself was only a per curiam. If the Supreme Court's own guidelines for interpreting such opinions holds true, *see* note 8, *supra,* then lower courts are compelled to return to the basic statement of the Fourth Amendment concerns in *Terry. Terry* provides lower courts with the only clear majority statement of the interests to be considered in this context. In light of the Supreme Court's refusal to issue a clear statement on the use of the profile and the facially inconsistent results reached in the case by case treatment of the issue, both in the Supreme Court and most lower courts, a return to the majority statement in *Terry* is only logical. The inquiry necessarily narrows to the bounds of *Terry:* whether there are reasonable, articulable facts and rational inferences from those facts which would justify any stop and, if so, whether the intrusion is sufficiently limited to remain justifiable absent probable cause. It is only in terms of this basic Fourth Amendment analysis that the drug courier profile can be properly addressed.

S.Ct. at 1325. Recognizing that the government is urging us to justify an exception to general Fourth Amendment requirements, we simply believe the narrow grounds set out in *Terry* for such an exception are not present here. Granting that the government interest in quelling the surge of drug traffic in this country is extremely important, the intrusion in this case remains unjustifiable. First, as noted, we believe that the conclusion of illegality drawn from the checking of an empty suitcase is not a "rational inference" within the meaning of *Terry.* Moreover, Demnik himself, the relevant law enforcement officer, had no basis from which to conclude that the apparently weighted suitcase Saperstein claimed in Detroit was the same as that he purportedly checked through to New York. Having concluded above that the other characteristics allegedly exhibited by the appellant are entitled to little or no weight when determining whether a seizure was justified, it is obvious that Demnik was simply unable to point to the specific, articulable facts necessary under *Terry* to justify his actions.[12] As the Supreme Court cautioned in *Terry:*

> in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw *from the facts* in light of his experience.

392 U.S. at 27, 88 S.Ct. at 1883 (emphasis added) (citations omitted).

Accordingly, we are unconvinced that *Mendenhall* dictates the result the government urges and, in fact, are convinced that, when read in conjunction with *Terry, Reid,* and now *Royer,* the Supreme Court's analysis of the issue commands the opposite conclusion. As such, we conclude that the district court's alternative basis for denying the suppression motion in this case was also erroneous.

In *Royer,* though finding that there was a sufficient basis upon which to justify a *Terry*-type investigative stop, the Court concluded that the seizure was otherwise unreasonable because it ultimately overstepped the limited bounds of *Terry.*[13] Our conclusions above, that a seizure did occur and that no seizure was reasonable, obviate the need to reach this issue. Accordingly, we decline to do so. We simply find that given the occurrence of the illegal seizure, any evidence gathered pursuant to that seizure was necessarily tainted and, thus, inadmissible. *Florida v. Royer; see also United States v. Lara,* 638 F.2d 892, 895 (5th Cir. 1981) (link between any illegal activity and discovery of cocaine is too direct and proximate to permit a finding of attenuation from such illegality to allow admission of the discovered cocaine).

### B. Seizure of Property—United States v. Place

■ The initial order in this appeal, filed August 27, 1982, indicated that a resolution of the issues raised was to be held in abeyance pending the Supreme Court decision in *United States v. Place,* —— U.S. ——, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). Though our analysis of the *Royer* issue would, by itself, justify vacation of the judgment in this case, a consideration of *Place* seems appropriate in light of that order.

The appellant claims that even if the initial seizure of his person was justifiable on the basis of reasonable suspicion, the seizure of his luggage was not. This was the precise issue addressed by the Supreme Court in *Place.* Raymond Place's behavior had allegedly aroused the suspicions of law enforcement officers at the Miami International airport and again at New York's LaGuardia airport. He was briefly stopped in Miami and was further questioned when he reached New York. Place refused to consent to a search of his luggage and one of

---

**12.** *See also Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979) ("the Fourth Amendment requires that a seizure be based on specific objective facts indicating that society's legitimate interests require the seizure of the particular individual").

**13.** *Florida v. Royer,* 460 U.S. ——, ——, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983) ("We also think that the officers' conduct was more intrusive than necessary to effectuate an investigative detention otherwise authorized by the *Terry* line of cases.")

the agents told him that they were going to take the luggage to a federal judge to obtain a search warrant. When Place declined an invitation to accompany the officers, they gave him telephone numbers where they could be reached and confiscated his bags. The bags were taken to Kennedy International airport where they were subjected to a canine examination by a trained narcotics detection dog. Approximately ninety minutes elapsed between the initial seizure and the "sniff test." The dog reacted positively to Place's luggage and a search pursuant to a subsequently obtained warrant revealed 1,125 grams of cocaine.

The Court of Appeals never considered the reasonableness of the initial stop and the Supreme Court denied certiorari on Place's cross-petition raising the issue of reasonable suspicion. Hence, the court never addressed this element of the encounter, leaving *Royer* to control the resolution of the first issue raised here. The *Place* decision does, however, provide considerable guidance for the proper resolution of the appellant's claim that the seizure of his luggage was impermissible, requiring the suppression of all evidence contained therein.

In an opinion authored by Justice O'Connor, the Court addressed the legality of seizures of personal effects when based on anything less than probable cause. The majority concluded:

> When an officer's observations lead them reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of *Terry* and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provid-

ed that the investigation detention is properly limited in scope.

___ U.S. at ___, 103 S.Ct. at 2644. The limitation in scope to which the Court referred was then defined by the purpose for the seizure and the length and nature of the detention. Applying these principles to the facts before the Court, and assuming the presence of reasonable suspicion, Justice O'Connor concluded that the detention of Place's luggage was *not* properly limited in scope.

The majority opinion expressly stated that the purpose for the seizure fell within the permissible bounds of a *Terry*-type investigative detention, finding that the extremely limited nature of the intrusion from a canine sniff (unlike a manual search) when balanced against the governmental interest in detecting drug couriers, justified the seizure even absent probable cause. In fact, the majority reasoned that the exposure of Place's luggage to a canine sniff, while that luggage was located in a public place, simply did not constitute a "search" within the meaning of the Fourth Amendment. The majority did conclude, however, that holding the bags for ninety minutes before the canine sniff, exacerbated by the agents' failure to give the respondent any indication of where the luggage was to be taken or when it could be retrieved, rendered the seizure unreasonable. The remainder of the Court concurred in the narrow determination that the seizure was impermissible and suppression of the evidence warranted.[14]

Putting aside our earlier discussion in which we concluded that there was an insufficient basis upon which to justify *any* stop, it is at least obvious that no probable

**14.** Justices Brennan, Marshall and Blackmun concurred in the result in two separate opinions. The gist of their complaint with the majority opinion was with the majority's haste to resolve the dog sniff issue and with the majority's analysis of *Terry v. Ohio* in the context of seizures of personal effects. Justice Brennan was of the view that *Terry v. Ohio* could not be used to justify seizures of property on less than probable cause. Justice Blackmun felt that while *Terry v. Ohio* may in some circumstances permit a temporary seizure of luggage for investigative purposes, the seizure of Place's luggage went well beyond the minimal intrusions contemplated under the *Terry* exception. Both agreed that the dog sniff issue was a far more complicated issue than the majority indicated and, thus, should not have been reached where it had not been reached below, was never briefed by the parties, and was unnecessary to the ultimate holding in the case. Justice Marshall joined both concurrences.

cause existed when the luggage was seized. In *Place,* the Court noted:

> At the outset, we must reject the Government's suggestion that the point at which probable cause for seizure of luggage from the person's presence becomes necessary is more distant than in the case of a *Terry* stop of the person himself.... [W]hen the police seize luggage from the suspect's custody, we think the limitations applicable to investigative detentions of the person should define the permissible scope of an investigative detention of the person's luggage on less than probable cause. Under this standard, it is clear that the police conduct here exceeded the permissible limits of a *Terry*-type investigative stop.

—— U.S. at ——, 103 S.Ct. at 2645. Thus, it is clear that the pertinent point of inquiry is the point at which the luggage was seized from the appellant.

The government argues that Saperstein's answers to the curbside inquiries did not satisfactorily resolve the discrepancies the agents perceived and were, thus, sufficient to give rise to probable cause. Virtually the same argument was rejected by the Supreme Court in *Royer.* The government specifically claimed as its third and final argument, that by the time consent to search Royer's luggage was given, the responses to the ongoing investigation had given rise to probable cause. The Court was unpersuaded that Royer's unsatisfactory answers could have escalated the tenuous reasonable suspicion present to the level

of probable cause permitting a search or an arrest.[15]

The government also contends that there was probable cause to detain the bags for any length of time once Demnik learned that the appellant was "of record" on the NADDIS computer.[16] Even assuming that this would give rise to probable cause, an assumption which we do not concede is a justifiable one,[17] the government is still unable to justify the detention here. First, the Court in *Place* specifically held that events occurring after the seizure are outside the relevant time frame for determining the reasonableness of that seizure. See discussion at page 19, *supra.* Secondly, if probable cause had existed, there was no need to await the use of the canine search and no justification for not obtaining a warrant immediately, thus cutting short the detention.

Given the lack of probable cause, and proceeding on the otherwise unjustifiable assumption that sufficient reasonable suspicion existed for any stop of the appellant, the seizure must fit within the narrow bounds of *Place* if it is to be deemed permissible. According to the analysis in *Place,* the detention of the appellant's luggage must amount to no more than an investigative stop as permitted under *Terry.* The *Place* majority concluded that the submission of luggage to a trained canine was not a search under the Fourth Amendment and, hence, was a permissible "purpose" for which to detain personal effects under *Ter-*

---

**15.** In *Florida v. Royer,* 460 U.S. ——, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), the Court rejected the government's argument with the following:

> We agree with the Florida Court of Appeals, however, that probable cause to arrest Royer did not exist at the time he consented to the search of his luggage. The facts are that a nervous young man with two American Tourister bags paid cash for an airline ticket to a "target city". These facts led to inquiry which in turn revealed that the ticket had been bought under an assumed name. The proffered explanation did not satisfy the officers. We cannot agree with the state, if this is its position, that every nervous young man paying cash for a ticket to New York under an assumed name and carrying two heavy American Tourister bags may be ar-

rested and held to answer for a serious felony charge.

**16.** Narcotic and Dangerous Drug Information System.

**17.** Though the officer's own belief in the presence of probable cause does not foreclose the state's attempt to now justify the seizure on that basis, we do find it relevant that this experienced DEA officer himself apparently did not believe that there was sufficient probable cause to secure a warrant, even with the NADDIS information. Instead, Demnik chose to attempt to establish probable cause to justify a warrant through the use of the narcotics detection dogs.

ry. We recognize that this language was unnecessary to the Court's ultimate holding and is, thus, technically dicta. Because we conclude that the seizure was not otherwise within the legal scope of the limited type of seizure outlined in *Place,* we need not address the issue of whether this Court is bound by, or should choose to follow, the earlier portions of the majority's analysis.

The Supreme Court concluded in *Place* that, "[t]he length of the detention of respondent's luggage alone precludes the conclusion that the seizure was reasonable in the absence of probable cause." —— U.S. at ——, 103 S.Ct. at 2645. *Place's* bags had been detained for ninety minutes prior to the canine examination. While the court was unwilling to set outer limits on *Terry* stops, the clear implication was that the permissible time frame for stops based on less than probable cause is severely restricted. In refusing to adopt a definitive guideline the Court was referring to the ALI, Model Code of Pre-arraignment procedure § 110.1(1) (1975) which recommends a maximum of twenty minutes for a *Terry* stop. *Id.* at ——, n. 10, 103 S.Ct. at 2646 n. 10. Combining this reference with the Court's failure to analyze the purpose for, or nature of the ninety minute detention, finding simply that the length of the detention was sufficient *in and of itself* to establish that the seizure was unreasonable, establishes an extremely limited time frame in which law enforcement officials may act in this context.

While we, too, see no reason to adopt a definitive time formula for every case, we have no doubt that the thirteen and one-half hour detention in this case renders the seizure impermissible and clearly warranted a suppression order.[18] Accordingly, the sentence and conviction entered by the district court is hereby vacated and the case RE-

MANDED to that court for further proceedings not inconsistent with this judgment.

MERRITT, Circuit Judge, dissenting.

The Court's holding that narcotic agent Demnick's encounter with the defendant at the Detroit airport constitutes an invalid seizure of the person under the Fourth Amendment appears to me to be directly contrary to the Supreme Court's recent opinion in *Florida v. Royer,* —— U.S. ——, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), and, if allowed to stand, will put an end to the effectiveness of the Justice Department's airport drug investigation program in the Sixth Circuit. I, therefore, dissent.

In *Royer* only one Justice expressed a view contrary to the following statement of the law in the Court's opinion:

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, and by offering in evidence in a criminal prosecution his voluntary answers to such questions. [citations omitted.] Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. *United States v. Mendenhall,* 446 U.S. 544 [100 S.Ct. 1870, 64 L.Ed.2d 497] (1980). The person approached, however, need not answer any questions put to him; indeed, he may decline to listen to the questions at all and may go on his way.

103 S.Ct. at 1324. That is all that happened here up to the point in time when the agent asked the defendant, and the defendant specifically and expressly agreed, to come to an office at the airport "to clarify some discrepancies." Before that time the agent

---

18. In *Place,* the court noted that while the length of the detention was sufficient by itself to render the seizure unreasonable,

> the violation was exacerbated by the failure of the agents to accurately inform respondent of the place to which they were transporting his luggage, of the length of time he might be

dispossessed and of what arrangements would be made for return of the luggage if the investigation dispelled the suspicion.

—— U.S. at ——, 103 S.Ct. at 2646. It appears from the record before this Court that the same exacerbating factors were also present here.

walked up to the defendant, and told him he was a narcotics agent and had some information about drug activities that he would like to ask the defendant about. The defendant answered the questions voluntarily. That was all there was to it. There was no detention and no seizure of the person—just some questions and answers on the street in front of the airport. No threats, no arrest, no hostility, no accusation beyond the suggestion of suspicion implied in all such airport encounters between a narcotics officer and a citizen who is approached.

What happened in that encounter, however, was very significant from the officer's point of view. The defendant lied about taking an empty suitcase to New York earlier the same day. The defendant falsely claimed that some person in New York had given him the suitcase for delivery to a third person in Detroit and that he did not know what was in the suitcase. The agent knew that the defendant had carried an empty suitcase to New York and, as a result of the conversation, knew that the defendant was trying to conceal what was in the suitcase through a series of fabrications.

Knowing all that, the only remaining question is whether the agent had probable cause under the Fourth Amendment in light of *United States v. Place,* —— U.S. ——, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), to seize and hold the suitcase overnight for inspection. The District Court has not ruled on that question, and I would therefore remand the case to the District Court for consideration of the issue. We should not try to decide that issue until the record has been developed and the District Court has had an opportunity to consider it. Accordingly, I respectfully dissent from the opinion of the Court holding that an illegal seizure of the person occurred in this case.