831 F.2d 298
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellant,
v.
Joslyn STEWART, Defendant-Appellee.
 No. 87-5044
 United States Court of Appeals, Sixth Circuit.
 October 8, 1987.
 
 Before NATHANIEL R. JONES, WELLFORD and RALPH B. GUY, Jr., Circuit Judges.
 Per Curiam.
 
 
 1
 This is an appeal by the United States from the district court's decision to suppress evidence seized by Drug Enforcement Agents during an airport search of appellee's luggage. Because we agree with the district court that appellee was seized in violation of her constitutional rights, we affirm.
 
 I.
 
 2
 Appellee, Joslyn Stewart, arrived at the Cincinnati Airport at approximately 6:15 p.m. on January 10, 1986 on Delta flight 324 from Atlanta. Drug Enforcement Agent (DEA) William Modesitt observed Stewart, a 5'2"' black woman, leave the aircraft. Modesitt noticed that she looked directly at him and appeared to look around the arrival gate as if looking for someone. The agent followed Stewart to a telephone where he overheard her conversation asking for an address and indicating that she would arrive by taxi. At the suppression hearing, Modesitt testified that this aroused his suspicion.
 
 
 3
 Following the phone call Agent Modesitt, along with two other DEA agents, Bauerle and Bass, followed Ms. Stewart to the luggage claim area. Modesitt claimed that she looked back over her shoulder at them several times. When Stewart reached the baggage claim area, the agents watched as she walked to the carousel being used for baggage arriving off her flight. Modesett and Agent Bauerle noticed that Stewart continued to turn and look over at them. After observing the baggage carousel and examining several bags without picking one up, Stewart approached a Delta agent. The Delta agent received a claim check from Stewart and went with her to an area where unclaimed baggage was kept. The agent checked the claim check against the number of a large Samsonite suitcase, and Stewart carried the suitcase away. Modesitt testified that only unclaimed baggage from earlier flights was kept in this area, and that no bag from flight 324 could be in this area as bags from that flight were still arriving on the carousel.
 
 
 4
 Upon receiving the suitcase, Stewart walked toward the taxi cab stand. As Stewart requested a cab, Modesitt stood behind her and out of her sight and indicated to the cab attendant not to order Stewart a cab. Modesitt had a prior arrangement with the attendant not to order a cab if Modesitt indicated that he had an interest in questioning an individual. Stewart then exited the airport terminal and headed toward the area on the sidewalk where the cabs picked up passengers. Modesitt testified that Stewart looked directly at him as she went through the door to the outside.
 
 
 5
 At this point, as the district court noted, the stories of the participants diverged. All witnesses reported that Modesitt approached Stewart and began to question her. Modesitt claimed that he approached her after she had exited the airport and was standing between the entrance and exit doors about 15-20 feet from the curb where a taxi would pull up. Stewart claimed Modesitt began questioning her as she was walking out the door, and stood directly in front of her between her and where the taxi would arrive. Agents Bass and Bauerle followed Stewart and Modesitt out the door and stood behind Modesitt as he questioned Stewart. Accounts of the distance and position of these two officers varied. Stewart claimed they stood between her and the taxi area, flanking her in a triangle formation. Modesitt said they were off to one side, but in a position to hear most of the conversation.
 
 
 6
 Modesitt identified himself as a police officer and asked Stewart for some identification. Stewart replied that she had none and Modesitt asked to see her airline ticket. Stewart fumbled through her purse and eventually offered Modesitt her boarding pass. By this point Modesitt noticed that Stewart was extremely nervous and was shaking and attempting to maintain a calm appearance. The boarding pass was in the name of Linda Johnson and indicated that she had travelled from Los Angeles. Stewart confirmed to Modesitt that her name was Linda Johnson and that she had travelled from Los Angeles to Concinnati to look for relatives. Modesitt asked Stewart where her relatives lived and was told that they lived in Montgomery. She went on to say that she was waiting to be picked up. Modesitt testified that he now believed Stewart was lying since he had overheard her receive directions to an address on Blair Street and, further, had observed her request a taxicab to take her into Cincinnati.
 
 
 7
 Stewart asked why she was being questioned, and was told by Modesitt that he was looking for narcotics coming through the airport. Modesitt informed Stewart that he was suspicious that she was involved with narcotics, and asked for her consent to search her person and luggage. Modesitt reported that he told Stewart she had the right to refuse. Stewart replied that she was 'not sure' and Modesitt repeated his request. According to Modesitt, Stewart appeared to be on the verge of complete panic and refused to look at him. Rather she looked away and appeared to by trying to gather her thoughts. Modesitt then asked Stewart to accompany him to an office inside the terminal to further discuss the matter.
 
 
 8
 Stewart picked up her bag and accompanied Modesitt to the first aid room, which was used by DEA. Once inside the room Modesitt further questioned Stewart, again voicing his suspicions and requesting permission to search her bags. Modesitt told her that she was not required to permit the search and that a search warrant would be obtained to search the bag if she did not consent.
 
 
 9
 Modesitt elicited from Stewart that she was not really Linda Johnson, and at one point Stewart denied that the luggage was hers. When Modesitt told her that he had observed her present the baggage claim check to the agent, Stewart began to cry and consented to the search of the luggage. Stewart searched in her purse for the key to the luggage and eventually at Modesitt's request dumped the contents of her purse out. Finally a key was produced from her suit pocket. The suitcase was searched and two plastic bags containing cocaine were located inside gym shoes.
 
 
 10
 Stewart was indicted in the Eastern District of Kentucky in February 1986 for possession of cocaine with intent to distribute in violation of 21 U.S.C. Sec. 841(a)(1) (1976). Soon after the indictment, Stewart filed a motion to supress the evidence seized in the airport search of her luggage. The motion was referred to a magistrate who held an evidentiary hearing on May 12, 1986. On July 7, 1986 the magistrate issued his report recommending that the motion be denied. The magistrate believed that there was reasonable suspicion justifying the agent's limited questioning of Stewart on the airport sidewalk. In this regard the magistrate specifically pointed to Stewart's 'knowingly frivolous search for luggage on the carousel when she knew that luggage had not been checked in Los Angeles.' J. App. 149. The magistrate found that a seizure had not occurred until Stewart was asked to accompany the agents to the office, but this brief investigatory detention was permissible because it was supported by a reasonable and articulable suspicion of criminal activity. Further, the magistrate found that consent to search the luggage was validly given and thus the search was proper.
 
 
 11
 Stewart filed timely objections to the magistrate's report and recommendation. Proceedings were held before Judge Surheinrich on July 25, 1986. On September 29, 1986 Judge Surheinrich rejected the magistrate's recommendation and in a memorandum opinion granted Stewart's motion to suppress. Relying solely on this court's decision in United States v. Saperstein, 723 F.2d 1221 (6th Cir. 1983) the district court found that the initial detention of Stewart on the sidewalk constituted a seizure because, among other things, Stewart was asked 'clearly incriminating questions.' The court further held that the officers did not have an articulable suspicion on which to detain Stewart. J. App. 155. Therefore, the court concluded, Stewart was seized in violation of her constitutional rights and the evidence obtained pursuant to her unlawful detention must be suppressed. This appeal followed.
 
 II.
 A.
 
 12
 The initial issue to be resolved whenever presented with an encounter between law enforcement officials and private citizens is at what point, if ever, a fourth amendment seizure has occurred. United States v. Clardy, 819 F.2d 670, 672 (6th Cir. 1987). It is well settled that not all such encounters are fraught with fourth amendment implications. Florida v. Royer, 460 U.S. 391 (1983). Only when an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may it be concluded that a seizure has occurred. United States v. Mendenhall, 446 U.S. 544, 552 (1980). This circuit has adopted the test used in Mendenhall for determining whether and when a seizure has occurred--'i.e., whether under the totality of the circumstances, a reasonable person would have believed he or she was not free to walk away.' United States v. Saperstein, 723 F.2d 1221, 1225 (6th Cir. 1983) (citations omitted).
 
 
 13
 In this case the government contends that a seizure did not occur under this test until agent Modesitt informed Stewart that he suspected her to be in possession of narcotics and asked her to accompany him to the office. Everything prior to that point, the government argues, was nothing more than consensual questioning which did not rise to the level of a seizure for fourth amendment purposes. In the government's view the questioning of Stewart during the initial encounter was precisely the type of questioning an officer is permitted to engage in without the encounter being characterized as a seizure. That is, Modesitt asked purely factual questions which related to his suspicions; he did not, contrary to the district court's conclusion, ask question that were 'clearly incriminating' or which called for clearly incriminating responses. The government contends, therefore, that to uphold the district court's decision as to when the seizure occurred would be to hold that any encounter wherein the nature of the officer's suspicion is revealed to a suspect is a seizure which must be supported by an articulable suspicion.
 
 
 14
 The problem with the government's analysis is that it focuses solely on the nature of the questions asked by the officer and fails to consider the 'totality of circumstances' which may have indicated to an individual that she was not free to leave. See Saperstein, 723 F.2d at 1226. That is to say, an officer's questions may indeed be non-threatening and innocuous, but if other circumstances exist which lead a reasonable person to believe they are not free to walk away, a seizure has occurred. See Clardy, 819 F.2d at 672; Saperstein, 723 F.2d at 1226.
 
 
 15
 In this case, the district court correctly determined that Stewart was seized during the initial encounter with the agents on the sidewalk in front of the airport. The totality of the circumstances existing at that time were such that a reasonable person would not have felt free to walk away or ignore the officer's questions. In the first place the officers prevented Ms. Stewart from leaving the airport by not only blocking her path to the curb, as in Saperstein, so that she could not get near a taxi, but also by secretly instructing the dispatcher not to order a cab for her. This latter fact on its own might be enough to support a finding that a seizure had occurred. It is not necessary for us to decide this question, however, because other circumstances were present in this case to indicate to Stewart that she was not free to leave. Specifically, Stewart, a slight woman in a strange city, was flanked by three agents (as opposed to only two in Saperstein); she was told by Modesitt that he nelieved she was carrying narcotics; she was twice asked to consent to a search of her luggage even though she had refused to give consent after the first request; and she was never told that she had a right to leave until after she had been taken to the office. All of these circumstances support the finding that Stewart was seized outside the airport. See also United States v. Tolbert, 692 F.2d 1041, 1044 (6th Cir. 1982), cert. denied, 104 S. Ct. 337 (1983).
 
 B.
 
 16
 The next inquiry is whether this seizure was permissible. 'In order to be permissible for fourth amendment purposes, a brief investigatory detention, . . . must be 'supported by a reasonable and articulable suspicion of criminal activity." United States v. Clardy, 819 F.2d at 672 (quoting United States v. Lucci, 758 F.2d 153, 155-56 (6th Cir.), cert. denied, 106 S. Ct. 129 (1985)). In this case the district court held that at the time Stewart was seized in front of the airport, the agents did not have the kind of reasonable and articulable suspicion that is necessary to justify a seizure. This decision was correct.
 
 
 17
 The basic test for determining whether a reasonable and articulable suspicion exists is, again, a totality of the circumstances test. In United States v. Cortez, 449 U.S. 411, 418 (1981), the Supreme Court established a two-pronged approach for reviewing the totality of the circumstances in cases where the legality of a stop is questioned. This circuit has adopted this approach in airport search cases. See Clardy, 819 F.2d at 673.
 
 
 18
 The first prong of Cortez allows for consideration of various objective observations made by trained law enforcement officers and the inferences these officers draw in light of their experiences and expertise. Cortez, 449 U.S. at 418. Generally speaking, the characteristics that make up the so called 'drug courier profile' fall into this first category. Clardy, 819 F.2d at 673. In this case the only characteristics of the drug courier profile that Stewart arguably met were that she arrived on a flight that the agents claimed was a good one to watch for narcotics traffic; she appeared to be watching for surveillance as she walked through the terminal; she pretended to look for luggage at the baggage carousel and then retrieved a bag that had arrived on an earlier flight; and she was nervous and agitated when questioned by agent Modesitt. The officers were entitled to draw certain inferences from these observations based on their experience with the 'patterns of operation of certain kinds of lawbreakers.' Cortez, 449 U.S. at 418.
 
 
 19
 The second prong of the Cortez test, however, requires that these inferences, considered in light of all the circumstances, must 'raise a suspicion that the particular individual being stopped is engaged in wrongdoing.' Cortez, 449 U.S. at 418. This aspect of the test is not met here. The fact that a person is 'nervous' or traveling from a 'source city' have been characterized by this court as 'inherently unsuspicious.' Saperstein, 723 F.2d at 1228. It is true that in this case the agents do not contend that Stewart was coming from a 'source city,' but rather that she was on a flight which they characterized as a 'good one to watch.' While this is arguably a better, more narrowly focused factor for an officer to consider than the city from which a suspect came, it certainly is not determinative and might also be properly characterized as inherently unsuspicious. Further, the fact that Stewart picked up luggage from an earlier flight is behavior that innocent travelers engage in and, even when preceded by a frivolous search for luggage on the carousel, cannot be said to provide a reasonable basis for a seizure. See Saperstein, 723 F.2d at 1229 (facts were more suspicious than those presented here yet the court refused to find an articulable suspicion sufficient to justify a seizure).
 
 
 20
 The totality of the circumstances, therefore, did not yield a particularized suspicion which warranted a seizure based on a reasonable and articulable suspicion of criminal activity. The combination of factors present in this case created nothing more than a 'hunch' in the officer's that Stewart was engaged in drug trafficking. Accordingly, the judgment of the district court suppressing the evidence obtained pursuant to this unlawful seizure is AFFIRMED.
 
 
 21
 WELLFORD, Circuit Judge, concurring.
 
 
 22
 This is a close and difficult case that might have been decided either way by the district court. Our decisions and those of the Supreme Court in airport stop and seizure cases involving transportation of drugs and drug couriers profiles have sent some conflicting signals in my view. Compare United States v. Mendenhall, 446 U.S. 544 (1980); Reid v. Georgia, 448 U.S. 438 (1980); Florida v. Royer, 460 U.S. 491 (1983); and, United States v. Place, 462 U.S. 696 (1983). Compare also United States v. Nembhard, 676 F.2d 193 (6th Cir. 1982); United States v. Saperstein, 723 F.2d 1221 (6th Cir. 1985); and, United States v. Williams, 754 F.2d 672 (6th Cir. 1985). Unless the district judge in these cases has committed clear error in his or her findings or has reached an unpermissible conclusion based on facts that have substantial support, I am reluctant to overturn a decision whether or not to suppress evidence.
 
 
 23
 While I find the evidence in this case to differ substantially from that in Saperstein, 723 F.2d 1221, the case relied upon principally by the district judge, I cannot find that he was clearly erroneous in his conclusion under all the circumstances. I am not at all sure that Stewart, as a reasonable person, may not have believed she was free to leave and discontinue the questioning at the outset if she were disposed to do so. I find no blocking of her path as determined by Judge Jones, and the fact that the agents had called off her cab was not then known to Stewart, whose knowledge and conduct we focus upon. I would not find this to be enough to support a finding that a seizure had occurred at this point.
 
 
 24
 Had I been called upon to decide the difficult issues here involved as a trial judge, I probably would have found that a reasonable and articulable suspicion existed for the action of the government agents. That consideration is not a proper factor to take into account of course; I recite it only to indicate the delicate problem of decisionmaking in these cases by the district court in the first instance.[1] I concur in the result reached in this case despite my express reservations and some misgiving.
 
 
 25
 RALPH B. GUY, Jr., Circuit Judge, concurring.
 
 
 26
 I concur in the result reached by Judge Jones, but I also wish to join with Judge Wellford in his concurrence. But for the deference that must be shown the trial judge in cases such as this, I would vote for reversal.
 
 
 
 [1]
 See the dissenting opinion of Judge Merritt in Saperstein, 723 F.2d 1233