**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Eddie Louis TAYLOR,**
**Defendant–Appellant.**

**No. 89–6396.**

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 15, 1990.

Decided Oct. 25, 1990.

Sidney P. Alexander, Asst. U.S. Atty. (argued), W. Hickman Ewing, Jr., U.S. Atty., Memphis, Tenn., for plaintiff-appellee.

Robert M. Friedman (argued), Lawrence W. White, Memphis, Tenn., for defendant-appellant.

Before MERRITT, Chief Judge, and KEITH and JONES, Circuit Judges.

KEITH, Circuit Judge.

Defendant Eddie Louis Taylor ("Taylor") was arrested on October 3, 1988 for possession with intent to distribute two kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1). Taylor moved to suppress the admission of the cocaine found in his luggage, arguing that he and the luggage had been seized in violation of the fourth amendment. After the district court denied the motion, Taylor entered a conditional guilty plea pursuant to Federal Rule of Criminal Procedure 11(a)(2). Finding that Taylor was seized in violation of the fourth amendment, we REVERSE.

I.

On October 3, 1988, at approximately 7:00 p.m., three plainclothed officers of the Memphis Police Department: Sergeant Joe Eldridge ("Sergeant Eldridge"); Officer Bonnie Bevel ("Officer Bevel") and Officer Forest Britt Roberts ("Officer Roberts") (collectively "the officers")[1] were stationed at the Memphis International Airport when they observed Taylor deplane a flight arriving from Miami, Florida. Sergeant Eldridge stated that Taylor, a middle-aged black man, appeared much different from the other deplaning passengers. The other passengers were dressed in business or vacation attire, while Taylor was clad in dark slacks, a work shirt and hat. Sergeant Eldridge stated that Taylor also carried what appeared to be a new designer travel bag. Sergeant Eldridge believed Taylor was probably the only black person on the flight.

Taylor did not stop at the luggage carousel. Sergeant Eldridge stated that Taylor, appearing nervous and constantly looking over his shoulder, walked rapidly through the terminal, exited, and proceeded toward the parking lot. The officers did not discuss whether they should follow Taylor. The officers had neither a "tip" from a confidential informant that Taylor was transporting a controlled substance nor had a police dog sniffed Taylor or his luggage and detected drugs. Without any forewarning that drugs or a drug courier would be on the flight, the officers decided to follow Taylor. Sergeant Eldridge, who had little training in identifying drug couriers and had been on the drug task force only six months, led the officers in the pursuit.

At this point, the account of what occurred varies. The district court, however, credited the officers' testimony. Taylor

---

**1.** The officers were members of the drug interdiction task force and assigned to stem the importation of illegal drugs into Tennessee.

testified that as he exited the terminal, Sergeant Eldridge grabbed his arm, forced him back from the curb, shoved a police badge in his face and ordered him to stop. Taylor saw the handle of Sergeant Eldridge's gun on his right hip. Sergeant Eldridge testified that upon exiting the terminal, he approached Taylor, identified himself, and ordered Taylor to stop because he wanted to talk to him. Sergeant Eldridge and Officer Bevel flanked Taylor while Officer Roberts assumed a position across the street between Taylor and the parking lot. The officers never informed Taylor that he did not have to speak to them or consent to a search of his personal effects. Officer Bevel identified herself and asked Taylor several questions: where was he going; where was he coming from; what did the bag contain; did he know anybody in Memphis; was he meeting anyone in Memphis; where was he going in Memphis; and did he have a contact person in Memphis.[2] Sergeant Eldridge asked Taylor to produce his airline ticket and some form of identification. Uncharacteristic of drug couriers, the name on the ticket matched the name on Taylor's Missouri driver's license.[3] Due to the physical positions of the officers and their aggressive questioning, Taylor felt he was not able to leave. In fact, he was *not* free to leave. Sergeant Eldridge testified that if Taylor had attempted to leave at any point, he would have pursued him.

Officer Bevel asked Taylor if she could look inside the bag he was carrying. Taylor did not verbally consent, but unzipped the bag, shuffled papers around in it and said "There's nothing that you are looking for here." Joint Appendix at 142. Transcript from Evidentiary Hearing ("Transcript") at 363, *United States v. Taylor,* 88–20270–01–H. The officers did not observe anything suspicious in the bag. Taylor testified that Officer Bevel then snatched the bag from his hands, placed the bag on the sidewalk and began searching it. In searching the bag, Officer Bevel discovered two packages wrapped in brown plastic tape. She recognized this as wrapping typically used for cocaine. At that point, the officers persisted in questioning Taylor, handcuffed him, told him he was under arrest and led him to the airport security office for further investigation.

Once in the security office, Officer Roberts advised Taylor of his *Miranda* rights. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The officers tried to convince Taylor to sign a written statement and consent to search form, but Taylor refused. Although Taylor never signed a consent form and the officers never produced a search warrant; they, nevertheless, removed the packages from the bag and made a small cut in one of the packages. Officer Roberts stated Taylor consented to opening the packages. The substance in the packages field-tested positive as cocaine. The officers searched Taylor and found $1000 in cash hidden in his socks and additional money in his pockets and wallet. Taylor's car, which was parked at the airport, was subsequently seized.

On October 11, 1988, Taylor was charged in a one-count indictment for possession with intent to distribute two kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1). At his arraignment on October 26, 1988, Taylor pled not guilty. On November 9, 1988, Taylor filed a motion to suppress evidence. In his motion, Taylor argued that the initial encounter amounted to an illegal detention and that he did not consent to the search of his bag. Evidentiary hearings were held on February 10, 14 and 28, 1989. On June 30, 1989, the district court issued its order denying Taylor's motion to suppress. The district court concluded, as a finding of fact, that Taylor consented to both the officers' interview and to the search of his bag. On July 28,

---

**2.** *See* Joint Appendix at 119–24, 136, 138–39. Transcript from Evidentiary Hearing ("Transcript") at 239–44, 355, 358–59, *United States v. Taylor,* 88–20270–01–H.

**3.** Taylor's airline ticket and driver's license were not returned to him immediately. Only after Taylor actually went to the police station and requested the license—more than one week after it had been taken—was it returned. Joint Appendix at 134. Transcript at 353.

1989, Taylor entered a conditional guilty plea to the charge while reserving his right to appeal the denial of the motion to suppress. *See* Fed.R.Crim.P. 11(a)(2). On October 26, 1989, the district court sentenced Taylor to 63 months of imprisonment, three years of supervised release, and a $3000 fine. A timely notice of appeal was filed on October 30, 1989. Taylor remains on bond pending the outcome of this appeal.

## II.

### A.

Taylor contends that the district court erred in finding that he was not seized in violation of the fourth amendment. Taylor maintains that his fourth amendment rights were violated when the officers seized him on the sidewalk outside of the Memphis International Airport terminal. We agree.

■ The fourth amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. These rights apply equally to criminal defendants as they do to every American citizen. The fourth amendment requires that searches and seizures be founded on objective justifications that encompass all seizures of the person "including seizures that involve only a brief detention short of traditional arrest." *Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980) (quoting *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975)). Although there are some circumstances wherein a person may be detained briefly, without probable cause,[4] "any curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid*, 448 U.S. at 440, 100 S.Ct. at 2754. *See Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); *Delaware v. Prouse*, 440 U.S.

648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979); *Brignoni–Ponce*, 422 U.S. at 878, 95 S.Ct. at 2578; *Terry v. Ohio*, 392 U.S. 1, 16–19, 88 S.Ct. 1868, 1877–79, 20 L.Ed.2d 889 (1968).

We recognize that our government is in the midst of waging a "War on Drugs." Yet, the valiant effort of our law enforcement officers to rid society of the drug scourge cannot be done in total disregard of an individual's constitutional rights. In *United States of America v. Radka*, 904 F.2d 357 (6th Cir.1990) we addressed this problem:

> Presently, our nation is plagued with the destructive effects of the illegal importation and distribution of drugs. At this critical time, our Constitution remains a lodestar for the protections that shall endure the most pernicious affronts to our society.... This drug crisis does *not* license the aggrandizement of governmental power in lieu of civil liberties. Despite the devastation wrought by drug trafficking in communities nationwide, we *cannot* suspend the precious rights guaranteed by the Constitution in an effort to fight the 'War on Drugs.'

*Id.* at 361 (emphasis added). Law enforcement officers cannot ignore the protections guaranteed by our Constitution—law enforcement officers cannot subject individuals to random invasions of their privacy.

■ Each case raising a fourth amendment issue "must be judged on its own facts." *United States v. Saperstein*, 723 F.2d 1221, 1227 (6th Cir.1983) (quoting *United States v. Mendenhall*, 446 U.S. 544, 565 n. 6, 100 S.Ct. 1870, 1883 n. 6, 64 L.Ed.2d 497 (1980)). Here, the initial issue to be resolved is whether Taylor was seized and, if so, when. The test for determining whether a seizure has occurred is "whether, under the totality of the circumstances, a reasonable person would have believed he or she was not free to walk away." *Saperstein*, 723 F.2d at 1225 (citations omitted). *See Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877; *United States v. Clardy*, 819 F.2d 670, 672 (6th Cir.1987); *United States v.*

---

4. *See United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (citing

*Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968)).

*Lucci,* 758 F.2d 153, 155 (6th Cir.), *cert. denied,* 474 U.S. 843, 106 S.Ct. 129, 88 L.Ed.2d 106 (1985). Circumstances that might indicate a seizure, "even where the person did not attempt to leave, would be *the threatening presence of several officers,* the display of a weapon by an officer, some *physical touching of the person* of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request *might be compelled."* *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877 (emphasis added). *See Terry,* 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16.

The government argues that *United States v. Collis,* 766 F.2d 219 (6th Cir.), *cert. denied,* 474 U.S. 851, 106 S.Ct. 150, 88 L.Ed.2d 124 (1985) is the controlling precedent.[5] We disagree. In *Collis,* we held that a seizure had not occurred when an officer: observed the defendant arrive from Miami; tapped the defendant on the shoulder; identified himself as a DEA agent; and the defendant willingly and voluntarily cooperated with the agent. *Id.* at 221. *Collis* bears absolutely no similarity to the present case. Here, Taylor was not tapped simply on the shoulder, but was grabbed forcefully by the arm. Taylor did not put up any resistance to cooperating with the officers. Taylor did not flee or try to escape. The officers surrounded Taylor, and he answered the officers' questions because he felt compelled to do so. In *Collis,* we stated:

> *Absent coercive* or *intimidating behavior* which *negates* the reasonable belief that compliance is not compelled, [the agent's] questions for additional identification and voluntarily given information

from the defendant does not constitute a seizure under the Fourth Amendment. *Id.* (emphasis added). That the officers used coercive and intimidating behavior in this instance renders *Collis* inapposite. Furthermore, Sergeant Eldridge testified that Taylor was not free to leave. Taylor's detention constituted a seizure under the fourth amendment.

The facts of this case, indicate that the officers seized Taylor as he stood outside the airport and prepared to cross the street. Taylor testified that upon exiting the airport terminal, Officer Eldridge grabbed his arm and forced him back from the curb to talk to him:

Q: Okay. Now, when was the first time that you knew that a police officer was following you?

A: Well, I didn't really know that a police officer was following me at all. What I done, (sic) when I got ready to step off the sidewalk, as I got ready to step off the sidewalk, someone said, excuse me, sir. I didn't even bother to look back. And then they (sic) said, excuse me, sir, again. And as he said, excuse me, sir, the second time, he's pulling my arm, he's got me by the arm pulling me back. I am referring to Sergeant Eldridge....

Q: And the first time—what were you, how were you physically standing in relationship to the curb or the sidewalk when this officer seized your elbow?

A: I was standing right at the edge of it. My toes were almost on the edge, almost where they would hang off. I

---

5. In *Collis,* three Drug Enforcement Administration agents ("DEA agents") were conducting surveillance at the Detroit Metropolitan Airport, when they observed Collis deplane a flight originating from Miami, Florida. Collis was one of the first passengers to deplane. He walked quickly through the airport concourse to the baggage claim area. As he approached the baggage claim area, Collis nodded to an unidentified man. One of the DEA agents stopped Collis outside of the airport terminal, lightly tapped Collis on the shoulder, identified himself as an agent and asked Collis for permission to question him. Collis consented to the questioning and agreed to accompany the DEA agents back to the baggage claim area. As Collis and the

DEA agents were at the baggage claim area, the unidentified man: approached Collis; introduced himself as Collis' friend; and removed Collis' shoulder bag. One of the DEA agents immediately retrieved the bag and returned it to Collis. After anxiously pacing back and forth, Collis bolted through the terminal doors and ran into the parking lot with the DEA agents in pursuit. The parking lot was enclosed by a fence that blocked Collis' escape. Before the DEA agents could reach the fence, Collis heaved the shoulder bag over the fence and onto a concrete ramp. Thereafter, Collis was placed under arrest. The bag was recovered, searched and found to contain cocaine. *See Collis,* 766 F.2d at 220–21.

was standing there. And when this one car passed by, I started to step down. When I started to step down, that is when he pulled me completely back up on the sidewalk....

Joint Appendix at 131–33. Transcript at 348–50. Taylor also testified that the officers surrounded him. Because he could not pass them he felt that he was not free to leave.[6] Furthermore, on two separate occasions during the evidentiary hearing, Sergeant Eldridge testified that if Taylor attempted to leave at any point during the questioning—*before* the cocaine was found—he would have given pursuit.[7] The fact that Sergeant Eldridge intended to detain Taylor and prevent him from leaving may be sufficient to support a finding that a seizure occurred. Other circumstances were present, however, which indicate that Taylor was not free to leave.

The facts of this case, lead us to conclude that Taylor was seized in violation of the fourth amendment. Sergeant Eldridge grabbed Taylor from the curb and pulled him back to the sidewalk. The officers, albeit plainclothed, positioned themselves so that Taylor could not pass. Sergeant Eldridge testified that if Taylor attempted to leave, he would have given pursuit. Both Sergeant Eldridge and Officer Bevel asked Taylor a barrage of questions that he felt *compelled* to answer, particularly

since he felt he could not leave. Under the totality of the circumstances, a reasonable person at this point would not have felt free to walk away; therefore, Taylor was seized when he was stopped on the sidewalk outside of the terminal.

### B.

Since we have established that Taylor was seized, our next inquiry is whether the seizure was constitutionally permissible. For fourth amendment purposes, a brief investigatory detention is permissible if "supported by a reasonable and articulable suspicion of criminal activity." *Lucci,* 758 F.2d at 155–56; *See Reid,* 448 U.S. at 440, 100 S.Ct. at 2753; *Clardy,* 819 F.2d at 672. The totality of the circumstances are considered in determining which suspicions are "reasonable and articulable." *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

In *Cortez,* the Supreme Court established a two-prong test to determine the legality of a seizure. *Id.* First, the law enforcement officials must demonstrate the existence of "objective observations." *Id.* This requirement is satisfied by evidence of a common pattern of criminal activity. In this case, a showing that the defendant met several characteristics of the drug courier profile is relevant to determining the legality of the seizure.[8] Merely satisfying the

---

**6.** At the evidentiary hearing, Taylor testified that he felt he was not free to leave:

Q: Were they [the officers] on either side of you or both on the same side of you or which way were they?
A: They were in front of me at an angle ... they had enough space ... to where *I couldn't go between them.*

Joint Appendix at 137. Transcript at 357 (emphasis added).

**7.** On cross-examination, Sergeant Eldridge testified:

Q: Okay. You would have just given pursuit but you wouldn't have tackled?
A: Oh yeah, I would have kept after him.
* * * * * *
Q: [I]f he tried to move, if he tried to run ... you were going to give pursuit?
A: No sir, I said I would probably give pursuit....
Q: Why would you give pursuit if you weren't going to stop, so you could run along and get your exercise?

A: No, sir, I would follow him to where he was going.
Q: Follow him to where he was going?
A: Yes, sir ... If he took off, I would try to get some kind of communication and have somebody pull in behind him for some more surveillance.
Q: You would try to get him stopped?
A: *Definitely. Somebody at this point, they are definitely involved in something if they take off running.*
Q: They are definitely involved in something.
A: Yeah.

Joint Appendix at 109, 111. Transcript at 98, 105 (emphasis added).

**8.** The "drug courier profile" is an abstract of characteristics found to be typical of persons transporting illegal drugs. *Florida v. Royer,* 460 U.S. 491, 493 n. 2, 103 S.Ct. 1319, 1322 n. 2, 75 L.Ed.2d 229 (1983). The Drug Enforcement Administration has not committed the profile to writing. The drug courier profile has not re-

drug courier profile, however, "does not, standing alone, justify a seizure." *United States v. Tolbert*, 692 F.2d 1041, 1047 (6th Cir.1982), *cert. denied*, 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983). *See Reid*, 448 U.S. at 441, 100 S.Ct. at 2754. Second, under the totality of the circumstances, these "objective observations" must raise an articulable suspicion that the "particular" individual stopped is engaged in criminal activity. *Cortez*, 449 U.S. at 417, 101 S.Ct. at 695.

In the present case, the district court found that both prongs of the *Cortez* test were satisfied as Taylor: (1) arrived on a plane from Miami, Florida—a drug source city; (2) walked away from the gate nervously, hurriedly and moved faster than the other passengers; (3) constantly looked backwards as he walked; (4) carried a tote bag that he held tightly to his body; and (5) left the terminal walking very fast. The district court held the above factors provided the officers with a reasonable, articulable suspicion that Taylor was engaged in criminal activity at the time he was stopped. *See* Joint Appendix at 72. Order Denying Motion to Suppress Evidence, *United States v. Taylor*, 88–20270–H. We find that the *Cortez* test has not been met.

■■■ The officers failed to meet the first prong of the *Cortez* test because Taylor did not meet the drug courier profile. The officers believed that Taylor met the characteristics of a drug courier by arriving on a flight from Miami, Florida and walking quickly and nervously through the terminal. An officer "versed in the field of law enforcement," may arguably view these factors as suspicious. *Cortez*, 449 U.S. at 418, 101 S.Ct. at 695.[9] In this case, however, the officers—particularly Sergeant Eldridge who led the pursuit—had little training in identifying a drug courier.

Sergeant Eldridge had been with the Memphis Police Department twenty-two years, yet, in October 1988, he had been with the airport drug task force only six months. Even though Sergeant Eldridge stated that Taylor fit the drug courier profile, on cross-examination he *admitted* there is no true *"drug courier profile,"* and that he had had *little* on-the-job experience with it.[10] Sergeant Eldridge contradicts himself—in one breath he contends that Taylor fit the drug courier profile, but in the next he denies that a drug courier profile exists.

It is well-known that police manuals instruct officers to become familiar with their beat and to identify people who do not "belong." *See, e.g.,* Johnson, *Race & the Decision to Detain a Suspect*, 93 Yale L.J. 214, 226 (1983). Sergeant Eldridge testified that Taylor appeared "different" from the other deplaning passengers:

> Q: All right. Now go ahead now, how did the defendant appear on this occasion?
> A: He appeared [in] kind of a grunnchy (sic) type work clothes. He had a dirty black baseball cap with something wrote

---

ceived unanimous approval by either the Supreme Court or this circuit, as the combination of factors looked for varies among agents. *See Saperstein*, 723 F.2d at 1228. Instead, courts are required to determine "whether in each particular case the combination of facts present and the manner in which they are exhibited justif[y] a stop." *Id.*

9. In *Sokolow*, the Supreme Court stressed that in determining whether a defendant's characteristics are consistent with the drug courier profile, the factors must be evaluated in terms of the officer's training:

> We do not agree with respondent that our analysis is somehow changed by the agents' belief that his [respondent's] behavior was consistent with one of the DEA's 'drug courier profiles.' (citations omitted).... A court sit-

ting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that conclusion, but the fact that these factors may be set forth in a 'profile' does not somehow *detract* from their evidentiary significance as seen by a *trained agent.*

*Id.* at 1587 (emphasis added).

10. On cross-examination, Sergeant Eldridge replied:

> Q: [H]ave you ever had any formal training in what constitutes a drug career (sic) profile ... If so, tell me when and who taught you?
> A: Well, I—naw, I tell you, when you get into the word profile, I think we're starting to learn that there's no really (sic) criteria that you can actually say, yeah, hey, that is a druggy....

Joint Appendix at 97. Transcript at 34.

(sic) across the front of it, and little squirrley, kind of like captains wear, the little gold squirrels across the bill....

Q: In the military—called scrambled eggs?

A: There you go—scrambled eggs. And he had on, I think it was, a blue shirt with "Pace" or something written across the pocket. A pair of blue trousers, white tennis shoes.

Q: And why do you say he—why did he stick out?

A: *Well, the rest of the passengers that usually come from Miami flights is* (sic) *either business people or resort type people, people getting off in real casual nice looking clothes.* Like I say, it was just different seeing somebody getting off there looking like Mr. [Taylor] looked that night.

Joint Appendix at 87. Transcript at 11 (emphasis added). There is no dress code for passengers taking any flight. People are clad in a wide array of clothing whether or not they are coming from or going to a typical vacation spot. Using the flawed analysis employed by Sergeant Eldridge, *anyone* can not "belong" and fit the drug courier profile merely by their dress.

Officer Bevel testified that it was primarily Taylor's nervous behavior which caused her to believe that he had committed, or was in the process of committing, a crime. *See* Joint Appendix at 120. Transcript at 240. Furthermore, she testified that seventy-five percent of the individuals that the drug task force follows are black. *See* Joint Appendix at 117. Transcript at 211. Taylor was one of the first few people to deplane the flight. At the time he was stopped, Taylor was the *only* black person who had deplaned. In fact, Sergeant Eldridge and Officer Bevel believed Taylor may have been the only black person on the flight.

Many people, black and white, are constantly hurrying through an airport—they are looking around for the party meeting them or rushing to board a connecting flight. Walking fast or even running is not uncommon in an airport. Many people do not check-in their luggage to save time.

All of these actions constitute perfectly lawful behavior. Yet, when the officers saw Taylor hurrying through the airport, looking around, and not stopping at the baggage area, they determined that he fit the drug courier profile. This determination was inappropriate, because observing an individual walking quickly through an airport or nervously looking around is insufficient to warrant a search and seizure. Evidently, the agents were more apt to stop Taylor because of his race. *See Race & the Decision to Detain a Suspect,* 93 Yale L.J. at 234 ("Although the DEA has refused to commit the entire [drug courier] profile to writing, the profile clearly contains a racial component."). We cannot allow blacks and other minorities to become subject to unreasonable stops and governmental intrusions in airports because of their race.

Based on the officers' limited experience and the circumstances they observed, we conclude that they reasonably could not have suspected, as a matter of law, that Taylor was engaged in criminal activity. We find it particularly relevant that the *least* qualified officer, Sergeant Eldridge, led the pursuit. The evidence relied upon —Taylor's arriving on a plane from Miami, Florida, walking quickly through the terminal, clutching luggage—"describes a large category of presumably innocent travelers, who would be subject to virtually random seizures were [we] to conclude that as little foundation as there was in this case could justify a seizure." *Reid,* 448 U.S. at 441, 100 S.Ct. at 2754. Therefore, we believe the first prong of the *Cortez* test was not met.

■ The officers also failed to meet the second prong of the *Cortez* test because the factors that they relied upon evidenced unsuspicious behavior. We have held "certain behavior characteristics [are] inherently *unsuspicious* [of criminal activity] and thus, entitled to no weight in the calculation." *Saperstein,* 723 F.2d at 1228 (emphasis added). *See, e.g., United States v. Andrews,* 600 F.2d 563, 566 (6th Cir.), *cert. denied,* 444 U.S. 878, 100 S.Ct. 166, 62 L.Ed.2d 108 (1979) (nervousness deemed

consistent with behavior among innocent airport travelers and is entitled to no weight); *United States v. McCaleb*, 552 F.2d 717, 720 (6th Cir.1977) (circumstances where DEA agent observed three persons, two of whom were nervous, return on non-stop flight from Los Angeles to Detroit after short trip with only one suitcase did not provide specific and articulable facts to warrant investigatory stop). Travel to and from an alleged source city also is inherently unsuspicious behavior. In *Andrews*, we explained:

> [T]ravel from Los Angeles cannot be regarded as in any way suspicious. Los Angeles may indeed be a major narcotics distribution center, but the probability that any given airplane passenger from that city is a drug courier is infinitesimally small. Such a flimsy factor should not be allowed to justify—or help justify—the stopping of travelers from the nation's third largest city. Moreover, our experience with DEA agent testimony in other cases makes us wonder whether there exists any city in the country which a DEA agent will not characterize as either a major narcotics distribution center or a city through which drug couriers pass on their way to a major narcotics distribution center.

*Andrews*, 600 F.2d at 567.[11]

We find that Taylor's actions were inherently unsuspicious. The totality of the circumstances in the present case did not yield particularized suspicions that warranted a seizure based on a reasonable and articulable suspicion of criminal activity. Thus, we find Taylor's seizure unconstitutional and the evidence obtained as a result of that seizure must be suppressed.

### III.

Taylor contends that even if the initial seizure of his person was justified, he never gave verbal or written consent for the officers to search his bag. The government argues that Taylor explicitly consented to the search of his bag. The district court found as a matter of fact that Taylor consented to the search. We conclude, however, that such a finding was clearly erroneous.

■ It is well-settled that without a search warrant and in the absence of probable cause and exigent circumstances, the validity of a search depends on the defendant's purported consent. *See Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983). Furthermore, where the validity of the search rests on consent, the government has the "burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." *Id. See Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319, 329, 99 S.Ct. 2319, 2326, 60 L.Ed.2d 920 (1979); *Schneckloth v. Bustamonte*, 412 U.S. 218, 233–34, 93 S.Ct. 2041, 2050–51, 36 L.Ed.2d 854 (1973); *United States v. Williams*, 754 F.2d 672, 674–75 (6th Cir.1985).

Whether Taylor's consent was voluntary or the product of coercion, express or implied, rests upon an analysis of the totality of the circumstances. *See Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2047. We have held that consent "must be proved by clear and positive testimony and must be unequivocal, specific, and intelligently given, uncontaminated by any duress or coercion." *Williams*, 754 F.2d at 675. *See McCaleb*, 552 F.2d at 721.

■ There is sufficient evidence of coercion by the officers to negate any belief that Taylor voluntarily consented to the search of his bag. Sergeant Eldridge followed Taylor and grabbed him from the curb and back to the sidewalk. The officers surrounded Taylor so that he felt he could not leave without cooperating. These circumstances set the stage for the

---

**11.** The government maintains another significant, suspicious factor is that Taylor purchased his one-way ticket to Memphis in cash. Drug couriers benefit from the anonymity of cash transactions. *See Saperstein*, 723 F.2d at 1228. Here, however, Taylor purchased the ticket in his own name. Certainly, purchasing a ticket under one's legal name is uncharacteristic behavior for a drug courier. This casts further doubt not only on the officers' basis for stopping Taylor, but also on the reliability of the drug courier profile.

officers to elicit a positive response from Taylor to search his bag. Furthermore, the transcript of the evidentiary hearing shows that there was a clear contradiction between Taylor's and the officers' account as to what occurred. The record below, therefore, was not clear and unequivocal. Taylor testified that although he did not consent, he unzipped the bag, looked through it and told the officers he had nothing of interest to them. Officer Bevel stated Taylor did consent to the search. Taylor testified that Officer Bevel jerked the bag from him and violently searched it causing some of the contents to fall on the sidewalk.

Moreover, the officers never informed Taylor that he had the right not to consent to the search of his bag.[12] Even though the Constitution does not require " 'proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to a search,' [*Schneckloth*, 412 U.S. at] 234 [93 S.Ct. at 2051] (footnote omitted), such knowledge [or lack thereof is] highly relevant to the determination that there had been consent." *Mendenhall*, 446 U.S. at 558–59, 100 S.Ct. at 1879.[13] At no time during the stop did the officers inform Taylor that he did not have to cooperate and was free to withhold his consent. Consid-

ering the totality of the circumstances, we find that Taylor did not freely and voluntarily consent to the search of his bag.

 Next, we must determine whether Taylor, when taken to the security office, consented to the continued search of the bag and the opening of one of the packages in which cocaine was found. Here again, we find that Taylor did not consent.

The fourth amendment limits the search and seizure powers "in order to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *United States v. Martinez–Fuerte*, 428 U.S. 543, 554, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976). A search warrant issued by a neutral and detached magistrate protects individuals from capricious governmental interference. *See Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 368–69, 92 L.Ed. 436 (1948). Therefore, warrantless searches are *per se* unreasonable under the fourth amendment. They are upheld only in limited circumstances.[14]

From the testimony, it is evident that the officers asked Taylor to sign both a written statement and a consent to search form. Taylor refused both requests. Absent consent, exigent circumstances or one of the exceptions, a search warrant was needed

---

**12.** At the evidentiary hearing, Sergeant Eldridge testified that it was not his responsibility to inform Taylor that he had the right not to consent:

> Q: Everything that you consented to—you gave him no chance to consent or not to consent, did you, because you didn't tell him that he had a right not to?
> A: Well,—you are right, I didn't tell him that he had a right not to.
>
> * * * * * *
>
> Q: Okay. You did want him to know that he had the right to consent?
> A: That's up to him. Whether he had knew (sic) he had the right to consent or not, *it is not up to me to advise him that he has the right.* I can come up to any individual on the street and say I'm a police officer, but you don't have to talk to me but will you talk to me.
> Q: And you certainly didn't tell him he had a right to refuse you all to go in his bag?
> A: No, sir, I did not.

Joint Appendix at 108. Transcript at 96 (emphasis added).

**13.** In *Mendenhall*, twice the officers expressly told the respondent that she was free to decline to consent to the search. The Court found that these explanations by the officers substantially lessened the probability that their conduct reasonably could have appeared coercive. *See Mendenhall*, 446 U.S. at 558–59, 100 S.Ct. at 1879.

**14.** The exceptions to the warrant requirement include: automobile searches, *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); consent searches, *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); searches incident to a lawful arrest, *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); limited searches and seizures under the stop and frisk doctrine, *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); searches and seizures in hot pursuit of a fleeing felon, *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976); and searches and seizures to prevent the loss or destruction of evidence, *Vale v. Louisiana*, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970).

for the officers to lawfully search Taylor's bag. *See Katz v. United States*, 389 U.S. 347, 356–59, 88 S.Ct. 507, 514–15, 19 L.Ed.2d 576 (1967); 3 C. WRIGHT, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL 2d § 666 (1982). The officers had sufficient time and ample opportunity to secure a search warrant; nevertheless a search warrant was never obtained. Because the bag was searched and the package opened without a search warrant, the search was impermissible. *See Katz*, 389 U.S. at 357, 88 S.Ct. at 514. Since we hold that Taylor's consent, if any, was not voluntary, the search was not permissible. Therefore, the cocaine recovered from Taylor's bag must be suppressed as the product of an illegal search and seizure.

### IV.

The mere fact that a black man is observed walking quickly through an airport terminal does not raise the suspicion of criminal activity. Any attempt to detain such an individual, therefore, *must* be conducted within the parameters of the fourth amendment. In this instance, the fourth amendment's protections were ignored. The officers failed to establish that a reasonable, articulable suspicion existed to warrant Taylor's detention. Moreover, the facts do not indicate that Taylor consented to the search. Therefore, we order the suppression of evidence seized pursuant to this unconstitutional arrest, search and seizure. Although we recognize the importance of curtailing illicit drug use in our society, the "War on Drugs" can never license law enforcement officials to disregard the rights guaranteed by the fourth amendment of our Constitution.

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND the case for further consideration consistent with this opinion.

MERRITT, Chief Judge, concurring

I concur in the Court's conclusions about this case. I particularly agree that law enforcement agents cannot make a racial characteristic the predominant feature in the drug courier profile. Like the Court I can find no real basis for distinguishing this man from the other passengers who deplaned, except for race.

But I would reach the result even if race did not seem to be the overriding reason for the officer's intervention. Prior to obtaining any evidence whatever that could establish "probable cause," Officer Eldridge arrested Taylor. Eldridge candidly admitted as much when he testified: *Taylor was not in fact free to leave.* All of the signs and circumstances of the sidewalk confrontation point in the same direction. Thus prior to finding any evidence of a crime, Taylor was "seized" within the meaning of the Fourth Amendment. It was not a brief *Terry* stop to make inquiry. It was an illegal arrest.

The seizure of the contraband was a direct consequence of the illegal arrest. One need not necessarily debate the question of whether the opening of the bag was consensual at the moment Taylor unzipped it. In the larger sense it was coerced because it was the fruit of an unlawful arrest, and so the search was also unlawful.

Under our current law, there is no escape from the conclusion that the contraband must be suppressed. Constitutional rules protecting individual privacy and freedom from unreasonable governmental restraint apply to police officers as well as courts, and the officer's unnecessarily precipitous and coercive action in violation of these rules, unfortunately, has defeated his case.