925 F.2d 1465
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Orji ADIWE & Nonso Onugha, Defendants-Appellants.
 Nos. 90-1408, 90-1409.
 United States Court of Appeals, Sixth Circuit.
 Jan. 7, 1991.
 
 Before KEITH and BOGGS, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 Orji Adiwe ("Adiwe") and Nonso Onugha ("Onugha") (collectively, "defendants") appeal the final judgments and sentences imposed upon their conditional guilty pleas to conspiracy to distribute heroin. For the reasons below, we AFFIRM the respective judgments and sentences.
 
 I.
 A.
 1.
 
 2
 On June 13, 1989, officers assigned to the Drug Enforcement Administration Task Force at Detroit Metropolitan Airport received information that two African men had been observed at the north terminal displaying a large amount of currency. Three agents in plain clothes responded to the north terminal. While on the way, the officers met an airport security employee who indicated that she had observed two men, later identified as the defendants, at a security checkpoint. Both men appeared to be nervous. Onugha was so nervous that it took him many tries to open his briefcase at the security checkpoint. Adiwe was in an extreme hurry. The two men subsequently split up. The security officer followed Adiwe and Onugha to the "E" concourse where she observed them seated together. Adiwe and Onugha then looked in her direction, left their seats, and again separated.
 
 
 3
 After receiving both a physical and clothing description of the two men, the Task Force Officers began to search for them. Shortly thereafter, Agent Terrance Saunders ("Saunders") and Agent Greg Sykes ("Sykes") visually identified Adiwe headed towards the "D" concourse of Northwest Airlines.
 
 2.
 
 4
 Adiwe's physical and clothing description matched that given earlier by the security officer. The two agents came up from behind Adiwe and matched him stride for stride, one on his left and one on his right. The agents showed Adiwe their identification, told him they were police officers, and asked permission to speak with him. Adiwe stopped and set his briefcase down, at which time the agents requested to see his airline ticket and identification. Adiwe complied by providing both his airline ticket and his Nigerian passport.
 
 
 5
 The ticket had been paid for in cash. The agent noted that Adiwe was in a different concourse than his flight's departure gate. He also noted that the departure time for the flight had already passed.
 
 
 6
 When Adiwe took his passport out of his briefcase, Sanders could see a large amount of cash in a white envelope. An agent questioned Adiwe regarding the purpose of his visit to Detroit, the business he was in, how long he had been in Detroit, where he was going, and who he was with. The agents conducted a "pat-down" of Adiwe and a cursory search of his briefcase upon consent. Adiwe indicated that he found the entire incident quite embarrassing. The agents asked if he would prefer to continue in the privacy of the men's restroom. Adiwe responded affirmatively and went with the agents to the restroom.
 
 3.
 
 7
 Defendant Onugha was approached by Agent Leslie Fountain ("Fountain") at the end of the "D" concourse. Onugha was in the proper concourse for his ticket. Fountain showed Onugha his badge and asked to see Onugha's airline ticket. Onugha complied. The ticket was in Onugha's name. Fountain asked to see Onugha's passport. Onugha opened his briefcase. Fountain could see a substantial amount of currency wrapped in a rubber band in the briefcase. Onugha said that his friend had his passport, and pointed down the concourse. Onugha said he was in the country legally but his visa might have expired. Fountain suspected that Onugha had no passport, and thought there might be an immigration violation. Fountain asked Onugha if he wanted to go get his passport from his friend. Onugha then went with Fountain down the concourse and entered the same restroom as Adiwe, accompanied by Fountain.
 
 4.
 
 8
 Onugha told the agents in Adiwe's presence that Adiwe had Onugha's passport. Adiwe responded that he had just met Onugha while at the airport and didn't know his name. He denied possession of Onugha's passport. Adiwe then initiated a conversation with Onugha to which the agents were not privy.
 
 
 9
 Fountain asked Onugha for permission to search his briefcase. Onugha opened the briefcase and found his passport. Fountain does not remember if he looked at it to see if the visa had indeed expired. Onugha then stepped back and Fountain searched the briefcase. While Fountain was searching, Saunders asked Onugha "Would you allow my partner to search you for drugs and drug related proceeds?" Joint Appendix at 99. (Evidentiary Hearing Testimony of Saunders.) Sykes showed Onugha his badge. Onugha said "Sure, okay." Joint Appendix at 138. (Evidentiary Hearing Testimony of Saunders.) Onugha was very nervous. He was shaking, his movements were very jerky, and he was breathing hard. He walked over to Sykes and leaned against the wall to be searched. Sykes patted him down. When he reached Onugha's groin area, Onugha brought his hands down from the wall and placed them over his groin. Sykes asked Onugha what was in his pants. Onugha was very nervous, was shaking, and had his hands in front of him. After shouting no, no, meaning he would retrieve it himself, Onugha very quickly pulled out an object from within his trousers and threw it in a trash receptacle. Sykes retrieved the article which appeared to be narcotics. Both men were placed under arrest. It was later determined that the article contained heroin.
 
 B.
 
 10
 On July 12, 1989, a federal grand jury returned a two-count indictment charging Adiwe and Onugha with conspiracy to distribute heroin, in violation of 21 U.S.C. Secs. 846, 841, and possession with intent to distribute heroin, aiding and abetting, in violation of 21 U.S.C. Sec. 841 and 18 U.S.C. Sec. 2. Each defendant filed a motion with the court seeking to suppress approximately seven ounces of heroin seized by government agents. The district court denied the motions to suppress on September 29, 1989.
 
 
 11
 The district court found that the seizure of both defendants occurred when Onugha entered the restroom. At that point, a reasonable person would believe he was no longer free to leave. The district court also found that Adiwe consented to his search. It found that the initial approach by Fountain to Onugha was not a seizure, but rather Onugha was seized when he could not find his passport and was accompanied by Fountain to get it from his friend.
 
 
 12
 The trial began on October 2, 1989. The following day defendants each tendered a plea of guilty, pursuant to Rule 11 plea agreements, to the offense of conspiracy to distribute heroin. Each plea agreement provided for a maximum period of incarceration of sixty-three months. In addition, each plea, entered pursuant to Fed.R.Crim.P. 11(a)(2), permitted each defendant to appeal the district court's denial of the motions to suppress.
 
 
 13
 Each defendant was sentenced on March 21, 1990. At the time of the sentencing, the government requested, in consideration for "substantial assistance" provided by each defendant since the date of the plea, that the court impose a sentence below the five year mandatory minimum. Based upon the government's request, the court sentenced each defendant to thirty-six months in prison. Defendants timely appealed their respective judgments and sentences based upon the suppression ruling.
 
 II.
 A.
 1.
 
 14
 Defendants argue that the package retrieved from Onugha's pants and the statements made by each of them should have been suppressed on the grounds that they were the result of an illegal search. To determine the legality of the search, it is necessary to trace the order of events and determine at what point defendants were subjected to government conduct that amounted to a seizure or a search under the fourth amendment.
 
 
 15
 The test for determining "whether a seizure has occurred is 'whether, under the totality of the circumstances, a reasonable person would have believed he or she was not free to walk away." United States v. Taylor, 917 F.2d 1402, 1405 (6th Cir.1990) (quoting United States v. Saperstein, 723 F.2d 1221, 1227 (6th Cir.1983)). A brief investigatory detention, while a seizure, is permissible if a totality of circumstances indicates it is "supported by a reasonable and articulable suspicion of criminal activity" Id. at 1407 (quoting United States v. Lucci, 758 F.2d 153, 155-56 (6th Cir.), cert. denied, 474 U.S. 843 (1985)).
 
 
 16
 A search in the absence of a warrant requires consent unless there is probable cause or exigent circumstances. See Florida v. Royer, 460 U.S. 491, 497 (1983). If the government relies on consent, it has the burden of proving that consent was obtained and that it was freely and voluntarily given. The government must show that the defendant did not merely submit to a claim of lawful authority. Taylor at 17.
 
 
 17
 The initial contacts of the agents with defendants were not seizures under the fourth amendment. Police officers have the right to address people conversationally with the hope of a voluntary exchange. United States v. Garcia, 866 F.2d 147, 150 (6th Cir.1989).
 
 
 18
 Examination of the instant case reveals that the circumstances of the initial contacts were not coercive. Both defendants were approached in a courteous, matter-of-fact manner. Adiwe was approached by the agents on his sides, rather than in front of him. They did nothing to physically intimidate him, nor did they touch him. No weapons were displayed and the officers did not retain any of his property.
 
 
 19
 Onugha was approached by only one plain clothes agent, Fountain. The agent did not attempt to impede Onugha's travel in any manner, nor did he display a weapon. Fountain did not threaten or intimidate Onugha.
 
 2.
 
 20
 Having determined the initial contacts did not implicate the fourth amendment, we must go on to examine the facts that influenced each defendant to go to the restroom. If defendants were illegally seized when they went to restroom, any consent given there would be invalid.
 
 
 21
 Whether a person's consent to accompany agents was voluntary or the product of duress or coercion is to be determined by review of all the circumstances surrounding the incident. United States v. Mendenhall, 446 U.S. 544, 557 (1980). Circumstances of coercion were found to exist where officers retained possession of defendant's ticket and drivers license, and directed him to accompany them to a police interrogation room. Florida v. Royer, 460 U.S. 491 (1983).
 
 
 22
 In Mendenhall the Supreme Court held that the fourth amendment had not been violated when a woman went with the agents to an office since her consent was voluntary. The woman had not been told that she had to go to the office, but had simply been asked. There had been neither threats nor any show of force. The woman had been questioned only briefly at the time of the initial contact. Her ticket and driver's license had been returned to her prior to the time she had been asked to go to the DEA office.
 
 
 23
 We find that Adiwe went to the bathroom consensually to avoid embarrassment. Adiwe's consent to go to the bathroom was similar to the consent in Mendenhall and dissimilar to that in Royer. It was only after Adiwe had said he was embarrassed by the public questioning that a more private place was suggested by the agents. All of his documents had been returned to him.
 
 B.
 
 24
 Onugha was not seized until the agent had not only reasonable suspicion, but also probable cause to believe that Onugha had committed an immigration violation. It was after Onugha informed the agent that he was a foreign citizen travelling in the United States, that he did not have his passport with him and that his visa had expired that he was no longer free to leave. While Onugha, unlike Adiwe, was not free to leave as he entered the restroom, Onugha was properly detained because there was probable cause to believe he had violated immigration laws.
 
 
 25
 After Onugha went into the bathroom, additional evidence accumulated that supported a reasonable suspicion, and then later probable cause, for the agents to believe defendants were involved in criminal activity. Onugha had said his friend had his passport. When Onugha arrived in the bathroom, Adiwe pretended that he and Onugha were not friends, but had only met in the airport. The agents had identified defendants as two people who had come through security together and had previously pretended not to be associated with each other. Onugha had been extremely nervous. Adiwe had a ticket that was for a flight which had already departed and which had been scheduled to depart from a different area of the airport. Thus even if probable cause on the basis of an immigration violation dissipated after the agent could examine Onugha's passport, the totality of the facts had by then created reasonable suspicion that the defendants were taking part in criminal activity. Therefore the continued stop was legal, allowing the agents to make further inquiry.
 
 
 26
 Because the stop was legal, it did not taint the consent to search. Onugha's consent to a search was properly given. The district court found that Onugha freely and voluntarily consented to a search of his person. Joint Appendix at 274. It rejected as incredible Onugha's and Adiwe's claims that they had not consented. The court relied on several inconsistencies in defendants' statements for doubting the credibility of the defendants' statements. Joint Appendix at 275. These factual conclusions of the district court are sustained by the record and we, therefore, do not disturb them. See Mendenhall at 557.
 
 
 27
 It was only after the agent had found a suspicious object in the groin area that consent may have been revoked by Onugha's protestation's "no, no." At that point, the agents had probable cause to believe there was contraband present on Onugha. The further search which resulted in Onugha removing the package was a legal search supported by probable cause that Onugha was concealing contraband. This probable cause resulted from the totality of the facts known by the agents at that time. The resulting contraband was therefore appropriately admitted at trial. Because of his previous contact with Onugha, his attempts to disassociate himself from Onugha, and the information the agents had concerning his cash payment for his ticket which was for a flight which had already left and which was scheduled to leave from another airport area, there also existed probable cause to arrest Adiwe. Denial of the motions to suppress was, therefore, proper.
 
 III.
 
 28
 For the foregoing reasons, we AFFIRM the March 21, 1990 judgments and sentences of the Honorable George La Plata, United States District Judge for the Eastern District of Michigan.